IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

| TORRES RANSOM, | ) |
|---|---|
| Plaintiff, | ) |
| v. | ) CIVIL ACTION 13-0010-WS-B |
| CITY OF CAMDEN, ALABAMA, | ) |
| Defendant. | ) |

# ORDER

This matter comes before the Court on Defendant's Motion for Summary Judgment (doc. 45). The Motion has been briefed and is now ripe for disposition.

## I. Background Facts.[1]

Plaintiff, Torres Ransom, brought this action against defendant, City of Camden, Alabama, complaining of mistreatment as a pretrial detainee in January 2011. Specifically, Ransom asserts a claim pursuant to 42 U.S.C. § 1983, that the City was deliberately indifferent to his serious medical needs, in violation of the Fourteenth Amendment Due Process Clause. (Doc. 12, ¶¶ 16-19.) He also interposes a state-law claim of negligence, in which he maintains that the

---

[1] The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007). Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in his favor. Also, federal courts cannot weigh credibility at the summary judgment stage. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices."). Therefore, the Court will "make no credibility determinations or choose between conflicting testimony, but instead accept[s] Plaintiff's version of the facts drawing all justifiable inferences in [his] favor." *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008).

City negligently permitted Ransom to suffer from inadequate care while in its custody or control. (*Id.*, ¶¶ 20-21.)[2]

### A. *Providing Medical Care to City Detainees at the County Jail.*

The material facts and circumstances are largely undisputed. Defendant, City of Camden, has not had a city jail since at least 2005, when its current Chief of Police, Lucas Knight, took office. (Knight Dep., at 6-7.) Although the City lacks a detention facility, its police force does make arrests for felonies and misdemeanors; therefore, City detainees are held in the Wilcox County Jail. (*Id.* at 10-11.) There is no written agreement between the City and Wilcox County delineating procedures governing care of City detainees in the County Jail. (*Id.* at 12.) In practice, the City pays the County a fee of $10.00 per day per City detainee housed at the Jail. (*Id.* at 13-14.) No City employees serve as jailers or act in any other staff, administrative or supervisory capacity at the Jail. (*Id.* at 17.) In the ordinary course, the extent of the City's involvement with the Wilcox County Jail is limited to arresting suspects and transporting them to that location for booking. (*Id.* at 17-18.)

From time to time, a City detainee held in the Jail may require immediate medical attention. In that event, the City's arrangement with the County is that, if the City has available officers, the City will transport the detainee to the hospital. (Knight Dep., at 18-19.) The City has done just that on particular occasions. (*Id.* at 19.) If, however, the City has no available personnel, the County transports the City detainee from the Jail to the hospital. (*Id.* at 19-20.)[3]

---

[2] At the outset of this case, Ransom named as an additional defendant Earnest Ivey Evans, Sheriff of Wilcox County, Alabama. (*See* docs. 1, 12.) On June 13, 2013, the undersigned entered an Order (doc. 32) dismissing Ransom's claims against Sheriff Evans upon receiving notification that those parties had entered into a *pro tanto* settlement. Plaintiff confirms this settlement in his brief. (Doc. 52, at 17.) Notwithstanding the resolution of his claims against Sheriff Evans, Ransom continues to pursue his claims against the City, which is the sole remaining defendant.

[3] Chief Knight's description of this arrangement was echoed by Sgt. Lorenzo Tyrone Dale, an officer in the City of Camden Police Department. Sgt. Dale testified that whenever he is notified by the County Jail that a City detainee requires immediate medical attention, his response is to "[t]ell the jail to call 911 and get them to get an ambulance and we will meet them down there … [i]f we're not on a call or something." (Dale Dep., at 29) Sgt. Dale has transported City detainees from the Jail to the hospital on multiple occasions. (*Id.* at 44-45.) When Sgt. Dale has encountered situations where an ambulance was needed to transport
(Continued)

The City of Camden Police Department is located approximately one-quarter mile from the Wilcox County Jail, and approximately half a mile from the local hospital. (Dale Dep., at 43-44.) Regardless of whether the City or the County handles these transportation arrangements, the City is responsible for the costs of medical care for any indigent, uninsured City detainee who requires medical attention while detained at the County Jail. (Knight Dep., at 21.) Chief Knight testified that whenever there was an issue as to whether the County or the City bore financial responsibility for an inmate's medical care, the "normal procedure" was to "[g]o on and get them medical treatment and worry about who's going to pay for it later." (*Id.* at 22-23.)

The record is devoid of evidence that, at any time other than January 2011, this understanding between the City and the County had resulted in City detainees not receiving necessary emergency medical care. There is no indication of any history of City detainees with immediate medical needs being neglected in the Jail because neither the City nor the County would arrange transportation to a medical facility. Nor does the record contain a scintilla of evidence that, prior to January 2011, the County had failed or refused to provide medical care to a City detainee whom the City was unable (because of staffing issues) to transport to the hospital. Stated differently, there is no evidence that, in any case other than Ransom's, the previously-described arrangement for furnishing medical care to City detainees housed at the Wilcox County Jail had ever proven ineffective, inadequate or otherwise deficient. If the City could provide transportation for City detainees to the hospital, it would do so. If not, the County would do so. Either way, the inmate would receive urgent medical care in a timely fashion. The gravamen of Ransom's claims in this action, however, is that this arrangement broke down when he experienced a medical emergency while housed at the Jail in January 2011.

### B. *Ransom's Arrest, Pain and Medical Treatment.*

Armed with those background facts concerning the arrangement between the City of Camden and Wilcox County, we now turn to Ransom's medical emergency. On the evening of Thursday, January 13, 2011, City of Camden Police Sgt. Lorenzo Tyrone Dale arrested Ransom

---

a City detainee from the Jail to the hospital, his response has been to direct the County to call the ambulance and then to meet the inmate at the hospital if he is able to do so. (*Id.* at 45.)

as a suspect in a residential burglary. (Dale Dep., at 10-15.)[4] Ransom never told Sgt. Dale at the time of the arrest that he was suffering from discomfort in his groin, or that he had any medical issues requiring attention; indeed, it is undisputed that no such problems existed as of the January 13 arrest. (Dale Dep., at 30.) Upon arresting Ransom, Sgt. Dale transported him to the Wilcox County Jail for booking. (*Id.* at 16.) Ransom was held at that facility pending charges of burglary, criminal mischief, harassment (based on Ransom allegedly threatening the arresting officers), and unlawful possession of marijuana and drug paraphernalia (based on items discovered on Ransom's person during a pat-down search). (*Id.* at 19-20.) For purposes of this Order, the Court assumes that Ransom remained a City detainee from the moment he was booked into the Jail on January 13, 2011, until a County deputy transported him to a local hospital six days later.

Ransom began experiencing pain in his groin "about a couple of days" after arriving at the Jail. (Ransom Dep., at 40.) His symptoms began on Sunday, January 16, 2011. At that time, Ransom asked a jailer named Vera Brooks "could she call the City and tell them to take me to the doctor." (*Id.* at 42.) Shortly thereafter, Brooks notified Ransom, "Tyrone say he ain't taking you nowhere." (*Id.* at 42-43.) For the next three days, Ransom remained in the Jail in acute discomfort. As he put it, "The pain was hurting so bad, I was beating on the window with plates and everything." (*Id.* at 44.) Each time he complained of physical distress, Brooks responded that there was nothing she could do. (*Id.*)[5] Ransom's condition worsened, as his left testicle

---

[4] Ransom insisted that City police officers had a history of unfairly "harass[ing him] all the time" and that "they just picked at [him] for nothing." (Ransom Dep., at 37.) City officers acknowledged that they had arrested Ransom before and he had a reputation in the community of "[a]lways stealing, always into something; a drug head." (Dale Dep., at 9-10.) Chief Knight estimates that City officers have arrested Ransom more than 20 times, mostly for burglaries. (Knight Dep., at 23-24.) At the time of the subject arrest, Ransom complained to Sgt. Dale, "I ain't did nothing," and the two of them "had a little argument going on" as Sgt. Dale escorted him to the Jail for booking. (Ransom Dep., at 23-24.) There is no evidence, however, that Sgt. Dale (as opposed to Assistant Chief Victor Dale) had any involvement, control, or decision-making authority over whether Ransom did or did not receive medical care at the Jail; therefore, plaintiff's reliance on these facts to suggest that the City's conduct amounted to intentional wrongdoing by Sgt. Dale is unavailing.

[5] Ransom estimates that he complained of groin pain "about ten times" to Brooks over a 24-hour period. (*Id.* at 62.)

became swollen and he felt excruciating pain unlike anything he had ever experienced. (*Id.* at 45.) From Sunday, January 16, 2011, until Wednesday, January 19, 2011, County officials provided no medical care to Ransom, even as he voiced continuous complaints of severe pain and displayed his swollen testicle in the window for Jail staff to see. (*Id.* at 45-46.) Finally, on January 19, Ransom explained his medical problem to a jailer named Josephine, who said, "well, I'm going to see if I can get you to the doctor today." (*Id.* at 46.) Within hours, Wilcox County Sheriff's Office personnel transported Ransom via County patrol vehicle to a local hospital. (*Id.* at 48-49.)

The examining physician opined that Ransom required immediate medical treatment in Selma, Alabama. (*Id.* at 50.) County personnel arranged for Ransom's bond to be lowered, and released Ransom after he and certain family members signed the bond. (*Id.* at 51.) Having thus been released from County custody, Ransom was transported by family members to a Selma physician. (*Id.* at 50-52.) Shortly thereafter, Ransom underwent an operation for removal of his left testicle. (*Id.* at 53; doc. 46, Exh. 7.) The physician who performed the surgery noted as his impression, "Delayed presentation of spermatic cord torsion." (Doc. 53, Exh. 1.) Plaintiff now attributes the noted "delay" to the City of Camden Police Department, blames the City's inaction for his severe pain and the ensuing surgery, and seeks to hold that defendant liable under constitutional and state-law theories.

### C. *The City's Knowledge and Involvement.*

Viewed in the light most favorable to plaintiff, the record reflects that between January 16 and January 19, the City's Chief of Police, Lucas Knight, had no contact with City or County personnel concerning Ransom's medical condition and need for treatment. (Knight Dep., at 40.) The first time Chief Knight became aware of Ransom's situation was on January 19, when he was notified that Ransom was going to Selma. (*Id.* at 40-41.)[6] Upon being so informed, Chief

---

[6] Taken as a whole, Chief Knight's testimony in pages 40-45 of his deposition transcript does not support a reasonable inference that he had knowledge of Ransom's circumstances prior to January 19. On summary judgment, however, plaintiff seizes on a single errant reference to "Sunday" (which was January 16) as meaning that Chief Knight must have been alerted to the problem on January 16, three days before Ransom received medical care. (Doc. 52, at 4-5.) During extensive questioning on this point, Chief Knight testified that the first time he became aware of the situation was on Wednesday (which was January 19), when he was told that Ransom was released and went to Selma for treatment. (Knight Dep. at 43-45.) A fair
(Continued)

Knight gave instructions "to get him to wherever he needed to go." (*Id.* at 41.) Similarly, Sgt. Dale was unaware of any issues at the County Jail regarding Ransom's health between the time of his arrest on January 13 and his release to Selma on January 19. (Dale Dep., at 30, 41.) The first notice the City Police Department received of Ransom's medical problem was on Monday, January 17, 2013, when a Jail official called the Department. Assistant Chief Victor Dale, who was working the day shift, fielded the call. He was the only City officer on duty. (V. Dale Dep., at 34.) Jail personnel informed Assistant Chief Dale that Ransom "was hurting and needing to go to the hospital," but did not provide specifics. (*Id.* at 21-22.) Assistant Chief Dale responded that he "was the only person working" and that he was unable to transport Ransom because there were people in his office. (*Id.* at 22-23.)[7] The Jail official on the phone with Assistant Chief Dale said "okay," without elaborating on Ransom's symptoms or condition, much less conveying any sense that this was a medical emergency or that the County intended to sit idly by while Ransom suffered. (*Id.* at 24.)

Approximately one day later, Assistant Chief Dale received a second call from an official at the Wilcox County Jail reporting that Ransom was "hurting in his privates." (V. Dale Dep., at 24.)[8] Assistant Chief Dale was working alone that day as well, with no other officers on duty. (*Id.* at 35.) The caller from the Jail "said that [Ransom] needed to go to the doctor." (*Id.* at 25.) Assistant Chief Dale "told them if he's hurting like that call the ambulance to pick him up." (*Id.*

---

reading of this deposition excerpt, taken in context, does not support a reasonable inference that Chief Knight knew of Ransom's medical problem (and lack of treatment) prior to January 19. Nor has plaintiff identified any other record evidence that might give rise to a genuine issue of fact as to whether Chief Knight knew of Ransom's medical problems prior to January 19 (the day that Ransom was released to Selma for surgery).

[7] Assistant Chief Dale's testimony was uncontroverted that he "had no way to take" Ransom to the doctor at that time because he was tied up with other responsibilities and was the only City officer on duty. (*Id.* at 37.) Assistant Chief Dale explained, "[M]y thought was if I could take him I would. … [I]f it came down to it and he needed to go and I can take him, I would take him." (*Id.* at 38.) But he was not able to do so at that time, and so informed the Jail staff.

[8] The Jail callers never told Assistant Chief Dale "how bad it was." (*Id.* at 30.) In this second call, however, they did provide some particulars concerning "what [Ransom] was complaining about." (*Id.*)

at 24.)[9] The Jail official on the phone did not tell Assistant Chief Dale that the County would not call an ambulance to transport Ransom or that the County would take no action, and did not otherwise express inability or unwillingness to comply. Instead, the person simply said "okay and that was it." (*Id.* at 28.) In Assistant Chief Dale's mind, "that was that. That would be what [the Jail] normally would do anyway: Call the ambulance." (*Id.* at 39.) Assistant Chief Dale did not follow up with Jail personnel to ascertain whether they had called an ambulance as he had advised them to do. The City received no other communications from Jail staff or County officials regarding Ransom's medical condition until the County took him to a local hospital on January 19, 2011.[10]

The next update that Assistant Chief Dale received concerning Ransom was on Wednesday, January 19, 2011. At that time, a County jailer notified him that "they took him to

---

[9] Assistant Chief Dale did not call the ambulance himself because Jail officials "would be able to tell the ambulance where to go in the jail to pick up this person. It's their jail." (*Id.* at 28.) According to his uncontroverted testimony, "we don't call the ambulance, the jail calls the ambulance anyway." (*Id.* at 38.)

[10] In an effort to create a genuine issue of material fact about the nature, content and frequency of the communications between Jail personnel and the City Police Department, Ransom points to evidence of what he says Jail officials told him about those calls. (Ransom Dep., at 42-45.) The City properly characterizes such evidence as inadmissible hearsay. Plaintiff makes no showing that Ransom's accounts of what Jail personnel told him City personnel had told them could be reduced to admissible form at trial; therefore, the evidence is properly excluded from the summary judgment analysis. *See, e.g., Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012) ("The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment," unless "the statement could be reduced to admissible evidence at trial or reduced to admissible form") (citations omitted); *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005) (on motion for summary judgment, courts consider "only that evidence which can be reduced to an admissible form"). Similarly, plaintiff's reliance on evidence of what County jailers told him they could or could not do to help him is irrelevant without some showing (which has not been made) that City officials knew or should have known that County jailers were operating on the premise that only the City could take Ransom to the doctor. There is no evidence, for example, that County jailers ever told Assistant Chief Dale or anyone else that the County was powerless to help Ransom get medical care, that the County viewed the problem as resting exclusively with the City, or that the County would fail or refuse to obtain medical care for Ransom despite his being in obvious distress. Nor is there any evidence that the City had any inkling that the County would adopt such a position with respect to Ransom or any other City detainee housed at the County Jail.

the doctor's office and then they ended up having to take him on to Selma." (*Id.* at 32.) Such information was provided after the fact.

**II.    Summary Judgment Standard.**

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed.R.Civ.P. The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

**III.    Analysis.**

*A.    Plaintiff's Constitutional Claim for Deliberate Indifference.*

As noted, Ransom's first cause of action alleges that the City violated the Fourteenth Amendment by showing deliberate indifference to his medical needs. Under well-settled law, "[d]eliberate indifference requires the following: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence." *Franklin v. Curry*, --- F.3d ----, 2013 WL 6728101, *3 (11th Cir. Dec. 23, 2013) (citation omitted). "A plaintiff must first show an objectively serious medical need that, if unattended, posed a substantial risk of serious harm, and that the official's response to that need was objectively insufficient. … Second, the plaintiff must establish that … the official subjectively knew of and disregarded the risk of serious harm, and acted with more than mere negligence." *Gilmore v.*

*Hodges*, --- F.3d ----, 2013 WL 6698070, *6 (11th Cir. Dec. 20, 2013) (citations omitted).  In other words, "[t]o be deliberately indifferent a prison official must know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Franklin*, 2013 WL 6728101, at *3 (citation omitted).

Here, the parties agree that Ransom has shown an objectively serious medical need that posed a substantial risk of serious harm while he was incarcerated at the County Jail.  Where the parties' positions diverge is on the question of whether plaintiff has made a showing from which a reasonable factfinder could conclude that the City of Camden subjectively knew of and disregarded the risk of serious harm to Ransom, and acted in a manner that went beyond mere negligence.  For the City to be liable, Ransom must show not only that his rights were violated, but that such constitutional tort was "the result of the city's unlawful policy or custom" (*i.e.*, that the City's deliberately indifferent custom or policy was the "moving force" or cause of the deprivation).  *Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1145 (11th Cir. 2007); *see also T.W. ex rel. Wilson v. School Bd. of Seminole County Fla.*, 610 F.3d 588, 603 (11th Cir. 2010) ("[T]o impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation.") (citation omitted).

To satisfy this threshold, Ransom relies on the City's "informal policy or practice" pursuant to which, if a City detainee has medical issues at the County Jail, (i) "the city is notified and the police department will transport the arrestee to the hospital if an officer is available;" (ii) "[i]f an officer is not available, the County transport[s] the inmate" to the hospital; and (iii) if an ambulance is needed, "the policy calls for the county to call the ambulance and for the city to meet the arrestee at the hospital."  (Doc. 52, at 12.)  Despite describing the City's "policy" in these terms, plaintiff advances neither argument nor authority that such a policy is unlawful or otherwise constitutes deliberate indifference to detainees' Fourteenth Amendment rights.  On its face, this policy provides that the City will attend to the medical needs of its detainees at the Jail if it has available personnel, but that otherwise the County will do so.  What is unlawful, unconstitutional or deliberately indifferent about that?  Plaintiff does not say.  By its terms, the policy as described by plaintiff does not disregard detainees' serious risk of medical harm, but

-9-

instead creates a multi-pronged system under which the City or the County arranges for transport from the Jail to a medical provider. Plaintiff has failed to identify any feature of this policy as unlawful or unconstitutional, and has otherwise failed to show how the City's policy violated Ransom's rights.[11]

Nor can plaintiff's § 1983 claim withstand summary judgment via a suggestion that the City had a custom or practice of disregarding the serious medical needs of its detainees. The record is devoid of evidence of even a single prior incident in which the County had failed to call an ambulance or otherwise arrange for medical care for a City detainee when City personnel were unavailable. For aught the record shows, the City's policy and practice had always worked effectively in the past, and the breakdown with respect to Ransom's treatment appears to be an isolated incident, which cannot support municipal liability under § 1983 on an unlawful custom theory. "A single incident would not be so pervasive as to be a custom … because a custom must be such a longstanding and widespread practice that it is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." *Craig v. Floyd County, Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011) (citations and internal marks omitted). "A single incident of a constitutional violation is insufficient to prove a policy or custom …." *Id.* at 1311; *see also Doe v. School Bd. of Broward County, Fla.*, 604 F.3d 1248, 1263 n.11 (11th Cir. 2010) ("As a general rule, an isolated incident, however unfortunate, does not demonstrate evidence of the County's persistent or widespread policy … and will not be considered so pervasive as to be a custom or practice.") (citations and internal marks omitted). Simply put, plaintiff has failed to come forward with any evidence of a persistent and widespread practice of City detainees not receiving adequate medical care in the Jail because the County refused to take

---

[11] Even if the City's policy were unconstitutional, Ransom could not hinge his § 1983 claim on it because the policy did not cause Ransom's injury. Under the version of the facts most favorable to Ransom, the City did everything it was supposed to do under the policy, but the County dropped the ball by failing to take action required of it when City personnel were unavailable to transport Ransom (who was housed in the County Jail) to a doctor. The County's failings are not fairly attributable to the City, much less to the City's policy, and therefore cannot form a cognizable basis for municipal liability. Stated differently, the "moving force" of the complained-of harm was not the City's policy, but the County's inaction despite actual knowledge of (i) Ransom's serious medical condition, (ii) the City's lack of available personnel to transport Ransom to a doctor, and (iii) the City's directive that the County should call an ambulance if Ransom was in severe pain.

action to transport a City detainee or call an ambulance.[12] *See generally Craig*, 643 F.3d at 1311 ("In the absence of a series of constitutional violations from which deliberate indifference can be inferred, the plaintiff[] must show that the policy itself is unconstitutional.") (citation omitted).

Plaintiff also opposes the City's Rule 56 Motion by arguing that Chief Knight's inaction was itself an unconstitutional act by a policymaker for which the City may be held liable. To be sure, municipal liability under § 1983 may properly be predicated on even a single incident based on "the actions of an official fairly deemed to represent government policy." *Doe*, 604 F.3d at 1263 (citation omitted); *see also Cooper v. Dillon*, 403 F.3d 1208, 1221 (11th Cir. 2005) ("[M]unicipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances.") (citation omitted). And defendant does not challenge the proposition that Chief Knight had final policymaking authority within the City of Camden Police Department as to care of detainees. The trouble is that plaintiff bases this theory of liability on the factually-unsupported notion that "the Chief of Police knew as early as Sunday [January 16] that the plaintiff needed medical care." (Doc. 52, at 15.) As previously addressed *supra*, no reasonable factfinder could so conclude based on a fair reading of Chief Knight's deposition testimony, which established that he first learned of Ransom's need for medical care on the day that Ransom went to Selma for surgery (*i.e.*, on Wednesday, January 19).[13] As such, plaintiff cannot defeat the City's Motion for Summary Judgment by arguing that § 1983 liability against

---

[12] Far from establishing that previous inmates in Ransom's circumstances had been deprived of medical care while the City and County pointed fingers at each other, the record reflects that prior to Ransom's detention, the policy and practice had functioned properly and that City detainees had received medical care via either the County or the City. (Dale Dep., at 44-45; Knight Dep., at 19-20.)

[13] Even if the record did support a reasonable inference that Chief Knight had knowledge of Ransom's medical problem on January 16 (and, again, it cannot), plaintiff's attempt to bootstrap City liability on Chief Knight's actions would fail absent evidence that Chief Knight knew or had reason to believe that (i) Ransom faced a risk of serious harm because of his medical condition, and (ii) the County would refuse to provide medical care to Ransom to alleviate this risk. No such evidence exists; therefore, this record does not support a reasonable inference that Chief Knight's acts and omissions constitute deliberate indifference to Ransom's constitutional rights, so as to subject the City to § 1983 liability for same.

the City rests on Chief Knight's acts and omissions as the City's final policymaker in the area of medical care for detainees.[14]

---

[14] Plaintiff's summary judgment brief sets forth two additional permutations of his argument for municipal liability on the § 1983 claim. Neither is persuasive. First, Ransom maintains that the record supports a reasonable inference that the City had no policy at all for the provision of medical care for City detainees housed at the County Jail, and that "[t]here is sufficient evidence from which a jury could conclude that the lack of a policy [led] to an unconstitutional act." (Doc. 52, at 14.) Assuming that no City policy existed, plaintiff would still have to establish "that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *American Federation of Labor and Congress of Indus. Organizations v. City of Miami, Fla.*, 637 F.3d 1178, 1187 (11th Cir. 2011) (citation omitted). The record is devoid of facts suggesting that a total failure to provide medical care to an inmate in distress is a "known or obvious consequence" of the City not having a formal policy of transporting City detainees to the hospital. Stated differently, it was not a "known or obvious consequence" that the County would do <u>nothing</u> to provide medical care for a City detainee in the Jail, whom the County knew to be suffering from a serious medical issue, unless the City developed a formal policy of providing such care. Indeed, it boggles the mind, defies common sense, and is inconsistent with the City's prior experience that the County would refrain from assisting an inmate housed in its Jail who was in obvious need of immediate medical attention, absent City intervention. Thus, any failing by the City to develop a policy was not deliberately indifferent to known or obvious consequences of such an omission. The harm to Ransom was not a "known or obvious consequence" of the City's omission.

Second, Ransom endeavors to construct § 1983 liability for the City on a theory of failure to train. As plaintiff puts it, "there is an obvious need for police offer[s] to receive training on how to care for the medical needs of the people they arrest." (Doc. 52, at 15.) The Eleventh Circuit has explained that "inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *American Federation*, 637 F.3d at 1188 (citation omitted). Plaintiff does not explain why it would make any sense for the City to train its police officers on how to care for medical needs of detainees at the County Jail, who were in the custody of County jailers, at a location where City police officers did not work and were not present, where such medical needs did not arise until several days after City police officers had any contact with such detainees. Nor does plaintiff explain how it could possibly constitute deliberate indifference for the City not to train its officers on "how to care for the medical needs" of detainees held in another governmental entity's detention facility under the supervision of another governmental entity's jailers, as to medical needs that arose long after the arrest had taken place and at a time when City police officers had zero contact with the detainees. Besides, plaintiff has failed to show a need for training City police officers on this point, given their clear understanding that they would transport City detainees to a doctor if they could, but that the responsibility otherwise rested with the County. Under the circumstances of this case, the City's failure to provide such training does not constitute deliberate indifference or give rise to municipal liability pursuant to § 1983.

For all of these reasons, the undersigned concludes that the record taken in the light most favorable to plaintiff does not support a reasonable inference that the City of Camden had a policy or custom that exhibited deliberate indifference to the constitutional rights of City detainees to receive adequate medical care for serious medical needs, much less that any such policy or custom was the moving force behind Ransom's injury. The County, not the City, had the pertinent facts about Ransom's medical condition and his obvious need for medical attention. The County, not the City, chose not to obtain medical care for Ransom, even after the City notified the County that no City officers were available and directed the County to call an ambulance. The County, not the City, abdicated responsibility for known serious medical needs of an inmate in the County's custody and control. The City was unaware of the existence of a problem, the severity of the problem, or the County's failure to take action to correct the problem until it was too late. Such a scenario simply does not constitute deliberate indifference by the City that might give rise to municipal liability on Ransom's Fourteenth Amendment due process claim.

### B. *Plaintiff's State-Law Negligence Claim.*

Ransom's only other claim against the City is a state-law cause of action for negligence. In the Complaint, plaintiff frames this claim as follows: "The [City] owed a duty of care to Mr. Ransom to protect him from harm and injury while in their custodial care. Said defendant[] breached that duty and negligently permitted Mr. Ransom to suffer from inadequate care." (Doc. 12, ¶ 21.)

By statute, Alabama law allows municipal liability for damages for an "injury or wrong … done or suffered through the neglect, carelessness, or unskillfulness of some agent, officer, or employee of the municipality engaged in work therefor and while acting in the line of his or her duty." Ala. Code § 11-47-190. To hold a municipality liable on a negligence theory, however, "there must first be a breach of a legal duty owed by that entity. … There must be either an underlying common law duty or a statutory duty of care with respect to the alleged tortious conduct." *Hilliard v. City of Huntsville*, 585 So.2d 889, 890 (Ala. 1991); *see also City of Mobile, Ala. v. Sullivan*, 667 So.2d 122, 125 (Ala.Civ.App. 1995) (similar). Plaintiff insists that the City of Camden owed Ransom a duty "to see that an inmate receives proper medical care." (Doc. 52, at 18.) But plaintiff cites no authority that might give rise to such a legal duty for the City in these circumstances. Again, Ransom was housed at the County Jail. He was in the custody of

County jailers. Alabama law imposed a statutory duty on the County (not the City) to provide medical care to Ransom. *See* Ala. Code § 14-6-19 ("Necessary clothing and bedding ***must be furnished by the sheriff or jailer***, … ***and also necessary medicines and medical attention*** to those who are sick or injured, when they are unable to provide them for themselves.") (emphasis added). Nothing in that statute imposed a corresponding duty on the City for its detainees in the County Jail. Nor did the City voluntarily assume such a legal duty of care to act as a backstop or failsafe if the County neglected to provide necessary medical care. To the contrary, the record establishes that the City only agreed to transport City detainees to the doctor if City personnel were available; otherwise, the obligation to arrange for medical treatment rested with the County. The County, not the City, called ambulances when necessary for injured or sick inmates. The County, not the City, possessed up-to-the-minute information concerning inmates' medical status and could evaluate whether they needed immediate medical attention. Nothing in Alabama law or the City/County agreement conferred a duty on the City to second-guess the County, to check up on the County, to deploy personnel to the Jail to peer over the County jailers' shoulders, or to conduct its own evaluations of inmates housed at the Jail to determine whether it agreed with the County's assessment of whether medical care was needed.[15]

Even if plaintiff had identified a legal duty owed by the City to Ransom, defendant would remain entitled to summary judgment on the negligence claim pursuant to the doctrine of intervening efficient cause. "It is settled law in Alabama that even if one negligently creates a dangerous condition, he or she is not responsible for injury that results from the intervention of another cause, if at the time of the original negligence, the intervening cause cannot reasonably be foreseen." *Prill v. Marrone*, 23 So.3d 1, 6 (Ala. 2009) (citations omitted). "In order for conduct to be considered an intervening efficient cause, it must (1) occur after the defendant's

---

[15] Plaintiff's duty argument might be more compelling if there were record evidence that the City had been on notice of a history or pattern of County deficiencies in obtaining medical care for detainees at the County Jail. In that event, it could reasonably be argued that the City should not accept on faith that the County jailers would fulfill their duty to provide medical care for City detainees, but instead owed such detainees a duty to verify that the County held up its end of the bargain. No such facts of a history or pattern of County shortcomings have been presented here. On this record, no reasonable factfinder could conclude that the City had reason to believe that the County could not be trusted to fulfill its obligations to provide medical care to inmates in need, such that the City would have a duty to maintain an oversight role of County Jail operations with respect to City detainees.

negligent act, (2) be unforeseeable to the defendant at the time he acts, and (3) be sufficient to be the sole cause-in-fact of the plaintiff's injury." *Id.* (citation omitted). The City maintains that even if it owed Ransom a duty of care, the County's failure to take any action to provide timely, adequate medical care to Ransom despite actual knowledge of the serious, emergency nature of his condition constitutes an "intervening efficient cause." The Court agrees. After all, the record unequivocally reflects that the County's failure to take action took place <u>after</u> the City had been notified of a problem. Moreover, the record is devoid of facts from which the County's omissions as to Ransom might have been foreseeable to the City. Simply put, the City had no knowledge and no reason to think that the County would allow Ransom to languish in the Jail for three days in obvious medical distress, without arranging for him to see a doctor. And the circumstances of Ransom's care are such that the County's omissions were the sole cause-in-fact of his delayed treatment. The County knew there was a problem. The County knew the City was unable to transport Ransom to the hospital. The County knew Ransom needed immediate medical care. At all times, the County could have transported Ransom to the hospital or simply called an ambulance (as the City personnel had directed it to do). Instead, the County did nothing for three days. The County did not even bother to inform the City that the County was not going to take any action with respect to Ransom. Because of that omission, the City did not know and had no reason to know that Ransom was suffering in the County Jail despite an obvious medical need. These circumstances constitute an intervening efficient cause that breaks the chain of causation running from any negligent acts by the City to Ransom's injury, such that the City's acts and omissions are "not the proximate cause of the plaintiff's injury, and, therefore, that the defendant is not liable." *Prill*, 23 So.3d at 6 (citation and internal marks omitted).

Because plaintiff has not identified a legal duty of care owed to him by the City of Camden, and because the County's acts and omissions were an intervening efficient cause that excuses the City from liability for Ransom's injuries as a matter of law, defendant is entitled to summary judgment as to plaintiff's state-law negligence claim.

**IV.  Conclusion.**

For all of the foregoing reasons, the Court finds that there are no genuine issues of material fact, and that defendant is entitled to judgment as a matter of law. Defendant's Motion

for Summary Judgment (doc. 45) is **granted**, and plaintiff's claims are **dismissed with prejudice**. A separate judgment will enter.

DONE and ORDERED this 10th day of January, 2014.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE